UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 08-61603-CIV-ALTONAGA/Brown

**UNITED STATES OF AMERICA**,

    Plaintiff,
vs.

**ONE 1990 BEECHCRAFT 1900 C TWIN
ENGINE TURBO-PROP AIRCRAFT**,

    Defendant.
_____/

## ORDER SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case was tried to the Court on several days beginning in August 2009 and concluding September 10, 2009. The Court has carefully considered the testimony of witnesses, the exhibits admitted in evidence, the parties' written submissions, and applicable law. The following findings of fact and conclusions of law are now made pursuant to the requirements of Rule 52 of the Federal Rules of Civil Procedure.

### I. Findings of Fact

Plaintiff, United States of America (the "Government"), filed a Verified Complaint for Forfeiture in Rem [D.E. 1] on October 7, 2008. It sued the Defendant, One 1990 Beechcraft 1900 C Twin Engine Turbo-Prop Aircraft, Venezuelan Registration No. YV219T, Serial UC118 (hereinafter "Beechcraft"), alleging the Beechcraft was forfeitable pursuant to Title 21 U.S.C. § 881(a)(4) as an aircraft used or intended for use, to transport or facilitate the transportation, sale, receipt or concealment of approximately 170 kilograms of cocaine. On October 23, 2008, Claimants, Carlos Enrique Gonzalez ("Carlos") and International Aviation, LLC ("International Aviation"), filed their Answer, and as an affirmative defense, alleged any illegal use of the Beechcraft "was without

Case No.  08-61603-CIV-Altonaga/Brown

the knowledge or consent of its owners." (*Answer* [D.E. 5] ¶ 23).  Carlos' claim was dismissed by Order dated January 13, 2009 [D.E. 24], and the only Claimant to proceed to trial was International Aviation.

In their respective Unilateral Pretrial Stipulations [D.E. 46, 50], the parties "agreed" to the following facts.  On January 13, 2008, the Beechcraft arrived at the Fort Lauderdale Executive Airport carrying 170 kilograms of cocaine inside.  The Beechcraft originated in Venezuela and made a brief stop at La Romana in the Dominican Republic, before making its way to Fort Lauderdale.  International Aviation is the owner of the Beechcraft.  The Beechcraft was purchased from Raytheon Aircraft Company for $1.1 million on December 9, 2005.  International Aviation is a Florida company organized under the laws of the State of Florida.

Juan Carlos Ynfante Gonzalez ("Juan"), Carlos' father, on behalf of Servicios Aereos Mineros, C.A. ("SERAMI"), a Venezuelan company, applied for and obtained an International Airspace Waiver request to fly the Beechcraft into South Florida.  SERAMI was the lessee of the Beechcraft.  The United States Federal Aviation Administration ("FAA") approved and authorized SERAMI's request for the International Airspace Waiver request on December 31, 2007.  The Beechcraft was used to smuggle 170 kilograms of cocaine into the Southern District of Florida on January 13, 2008.

The parties also "agreed" in their respective Unilateral Stipulations that the only issues to be litigated at trial would be: (1) whether the Government can established by a preponderance of the evidence that the Beechcraft is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(4) for facilitating the transportation, sale, receipt, possession or concealment of 170 kilograms of cocaine; and (2) whether International Aviation can establish, by a preponderance of the evidence, its affirmative

defense that it is an innocent owner of the Beechcraft, whose interest shall not be forfeited pursuant to 18 U.S.C. § 983(d). The evidence admitted at trial is summarized below, for the most part in the order presented.

At trial, Gregory James Ryan, formerly sales manager with Standard Aero, testified that in 2007 SERAMI requested that Standard Aero perform some engine maintenance work to the Beechcraft engines in a hangar at the Fort Lauderdale Executive Airport. During the course of the repair work, Mr. Ryan dealt with Juan and his son, Carlos. Indeed, Carlos assisted in disassembling the engines and replacing them, as he was a junior mechanic himself. Mr. Ryan dealt with Carlos and Juan, although, according to Mr. Ryan, the decisions were made by Carlos.

SERAMI paid all of the invoices for the repair work in 19 separate checks, totaling $213,000, consistent with the SERAMI-International Aviation lease agreement separately admitted in evidence, which makes the lessee responsible for repairs to the aircraft. After Standard Aero returned the Beechcraft to SERAMI, Juan informed Standard Aero there was some foreign object damage to the engines, and Standard Aero advised the aircraft would have to be returned as the repairs could not be done in Venezuela.

Notwithstanding its earlier position on the two issues to be litigated at trial, on the second day[1] of trial, International Aviation announced it was stipulating to probable cause, and requested that it be allowed to proceed with its innocent owner affirmative defense. International Aviation acknowledged there were illegal drugs in the Beechcraft, and the Government had met its initial burden of proof. So, after hearing from Mr. Ryan, and admitting the invoices for the repair work to

---

[1] The trial did not proceed sequentially on consecutive days, for reasons that are evident in the transcripts but which need not be repeated here.

Case No. 08-61603-CIV-Altonaga/Brown

the Beechcraft in evidence, the Court heard next from International Aviation's only witness, Carlos Gonzalez.

Carlos is 26 years old, he was born in Tulsa, Oklahoma, and was raised in Venezuela. His father, Juan, has always been in the airplane business, as a mechanic, pilot, and business owner. Carlos first took the controls of an airplane when he was 6 or 7. He is an aircraft mechanic and has a Venezuelan pilot's license. After he graduated high school in 2000, Carlos started working at his father, Juan's company, Aerocentro Servicios Caroni ("Caroni"). About a year later, Carlos came to the United States to study English in Tennessee, and then he moved to Daytona Beach, Florida, planning to study at Embry Riddle Aeronautical University. But he only completed an aircraft mechanic course at Broward Community College.

After leaving Daytona Beach in 2004, Carlos moved to Fort Lauderdale because his father, Juan, wanted to start a business in South Florida. Carlos started working for Share-A-Plane as an assistant mechanic. He also worked for Nimbus Aviation, a sister company to Share-A-Plane, constructing instrument panels. When he relocated to Fort Lauderdale, Carlos also established International Aviation on June 29, 2004; he is its sole employee. International Aviation was incorporated to start a charter airline business in South Florida for flights to the Caribbean. When International Aviation incorporated, Carlos was the only shareholder; his father Juan did not appear on the paperwork. Presently, Juan is 75% shareholder and Carlos owns 25% of the shares.

Because Carlos did not meet the requirements to operate a charter airline, initially International Aviation's work consisted of "providing logistical support for the maintenance of aircraft and to Venezuelan companies." (*Trial Transcript*, *Aug. 20, 2009* at 19). International Aviation was located at 2449 NW 55 Court, Hangar 30-A in Fort Lauderdale, sharing space with

4

Case No.  08-61603-CIV-Altonaga/Brown

Share-A-Plane and Nimbus.  It later moved to the hangar next door, renting that space and an office from Gerry Milton of South Tech Avionics.  To be a charter company, International Aviation needed an aircraft.  In February 2006, International Aviation purchased the Beechcraft from Raytheon.

Carlos participated in the purchase of the Beechcraft in his personal capacity and as a representative of International Aviation, although initially Juan handled all of the purchase negotiations with Raytheon.  Juan had located the aircraft and considered purchasing it for his company, SERAMI, but because of the unstable political situation in Venezuela, Carlos persuaded his father to purchase the aircraft under the name International Aviation.  International Aviation had no funds to buy the aircraft, so the funds came from the sale of an aircraft owned by Caroni, Juan's other company.  Carlos went personally to Aruba to close the purchase of the aircraft, but before going there he met with lawyers in Miami to prepare the closing documents.  Carlos signed the purchase agreement on behalf of International Aviation after inspecting the plane in Aruba and reviewing the log books.  Juan obtained insurance for the aircraft in Venezuela, and Carlos has no knowledge of the insurance beyond that.

Because Carlos was still attending Broward Community College, he and Juan decided it was best for the plane to be in Venezuela, as Juan's charter company, SERAMI, could use the aircraft for its clients, temporarily, for two years.  As stated, Juan and Carlos are the shareholders of SERAMI; Carlos is the Co-CEO.  International Aviation leased the Beechcraft to SERAMI.  The Beechcraft stayed in Aruba for approximately two months after its sale and before being taken by SERAMI to Venezuela, in order for the aircraft to be temporarily registered with the Venezuelan aviation authorities for use by SERAMI as the operator.  The Beechcraft arrived at the SERAMI premises in Venezuela in May 2006.

Case No. 08-61603-CIV-Altonaga/Brown

While the Beechcraft was chartering passengers in Venezuela, Carlos returned to Fort Lauderdale and provided "logistical support for the maintenance of aircraft for different companies." (*Id.* at 43). His customers included SERAMI, Claire Aviation, Orinoco Wing Air, and other companies in Caracas, Venezuela having some affiliation with Juan. Carlos has also been able to obtain work for the company with other people besides those referred by Juan. International Aviation would assist other companies in the purchase of aircraft parts meeting FAA standards. Other aircraft besides the Beechcraft have been in International Aviation's rented hangar space for repairs or for temporary placement. The logistical work of International Aviation was not enough to pay the company's expenses. Under the SERAMI-International Aviation lease agreement, SERAMI was to pay $10,000 a month, which it did not always pay, although it would pay for International Aviation's expenses and Carlos' salary.

Carlos kept track of what the Beechcraft was doing in Venezuela, receiving monthly packages of the flight logs. The logs were kept by SERAMI. From his review of the logs, Carlos believes the plane was used only for tourist charter flights within Venezuelan airspace. He kept track of the Beechcraft and not the other SERAMI airplanes, as the Beechcraft was to return to International Aviation at the end of the 2-year lease period.

The Beechcraft was brought to the United States for maintenance and repairs in order to comply with FAA regulations, as the plan was to have the plane operated in the future by International Aviation. Carlos was present when the plane came to the United States for repairs, as was Juan, although Juan did not remain throughout the entire repair period. According to Carlos, he was "mainly supervising all the work performed by all the people that [sic] work on the aircraft." (*Id.* at 68). He assisted in the removal and installation of parts. In addition to the engine work,

6

Case No. 08-61603-CIV-Altonaga/Brown

Carlos assisted in the removal of the propeller and landing gears for overhaul work to be performed. Juan did not participate in this work. The Beechcraft was in the United States for a month and a half for maintenance and repairs, and Carlos was with the plane every day in the hangar. He had nothing to do with payments to Standard Aero with the exception of one check issued from his personal account; the payments were handled exclusively by Juan, who was the source of funds.

At the conclusion, in December 2007, two SERAMI pilots and Carlos took the plane on a test flight before it was returned to Venezuela. Carlos put the landing gear down on the approach for landing when it did not come down on its own. Carlos also noted some additional problems with the instruments and provided Gerry Milton the information for repairs to be done. International Aviation and SERAMI kept log books of the repairs. Carlos and his father traveled in the plane on its flight back to Venezuela. During that flight, a whistling noise on the right engine was heard, and upon landing, following a mechanical inspection, bent blades were noted on the right engine, consistent with foreign object damage. Standard Aero was thereupon contacted by Juan, and because of warranty issues, it was decided to return the airplane to the United States for further repairs, following approval of the FAA.

The last time Carlos saw the Beechcraft was a few days before it departed Venezuela, at the SERAMI hangar. Carlos had no knowledge of the presence of cocaine on the aircraft prior to its seizure, and he had no reason to believe anyone who had access to the plane would place cocaine in the aircraft. Carlos learned about the seizure of the aircraft several days after it occurred, although Juan knew of the seizure almost immediately. Since the seizure of the Beechcraft, International Aviation has continued to operate its logistics business, and Carlos is presently restoring an airplane for a friend. According to Carlos, he goes by the International Aviation office every week or so.

7

International Aviation filed no tax returns for 2004, 2005, 2006, 2007 or 2008. Carlos first opened a business account for the company in November 2007.

On the day of the seizure of the airplane, Carlos was in Venezuela and Juan was in South Florida, waiting for the aircraft. Juan was also in South Florida taking care of criminal charges pertaining to a November 2007 arrest for a DUI. Juan returned to Venezuela three or four days later. Juan did not discuss with Carlos the seizure until after Juan had returned to Venezuela because Juan did not want Carlos to worry.

Carlos Contreras, regional sales manager for Standard Aero, also worked on the repair for the Beechcraft. He testified he worked with Carlos and Juan. While Carlos was present and assisting every day, Juan was only there sporadically. According to Mr. Contreras, he told Carlos and Juan that they needed to install or replace a rubber seal on the right engine, otherwise there could be foreign object damage to the engine. He also advised them if there was such damage as a result of the lack of a proper seal, the Standard Aero warranty would not cover that.

Juan Carlos Anglade was manager for the engine and propeller shop for Air Tech Servicios, an FAA repair station in Venezuela. Air Tech is located approximately 300 nautical miles from Puerto Ordaz, where the Beechcraft was stored by SERAMI. According to Mr. Anglade, Venezuela does have FAA certified repair stations at several of its airports. Juan was a customer of Air Tech and was one of Mr. Anglade's customers. When Mr. Anglade moved to South Florida in 2002, he started the business Share-A-Plane. When International Aviation was incorporated, Mr. Anglade gave Carlos, who also worked at Share-A-Plane, advice on how to accomplish that. According to Mr. Anglade, there are very favorable tax consequences to temporary versus full registration for Venezuelan aircraft.

8

Michael Phillip Grant of Grantech is an FAA certified aircraft mechanic. He has done repair work on the Beechcraft at the hangar of Gerry Milton at the request of Juan. Juan would pay for the work in cash. Because he was concerned about the large cash payments, Mr. Grant called his bank and filled out a currency transaction report to report a cash payment received totaling over $10,000. The name of the client appearing on the repair invoices is Juan, at Orinoco Wing Air, CA. The total amount paid to Grantech by Juan for repairs to the Beechcraft is $79,400. Mr. Grant recalls that during the time he was repairing the landing gear, propeller and other items on the Beechcraft, Carlos was continuously present supervising the work being done. Mr. Grant acknowledged that he had earlier done repair work for another plane owned by Juan, and when Juan came later with the Beechcraft, Mr. Grant was not responsible for writing the client's name in the Grantech records, rather the accountant for the company would have done that.

Gerry Milton is an avionics technician who has also worked on the Beechcraft. He rents hangar and office space at the Fort Lauderdale Executive Airport to International Aviation. International Aviation owes him five months in rent payments. When rent is paid, it is paid by wire transfers from Venezuela, from SERAMI. Sometime in January 2009 Carlos approached Mr. Milton and asked that Mr. Milton provide him with written receipts for past rent payments. Carlos told Mr. Milton to write the name of International Aviation on the receipts. Since the seizure of the Beechcraft, Mr. Milton has seen little activity at International Aviation. Prior to the seizure, he recalls seeing Carlos at the International Aviation offices two or three times a week, and now he does not see him for three, maybe four weeks at a time.

Drug Enforcement Administration ("DEA") Special Agent, Russell L. Johnson testified based on his review of records admitted that on the day the Beechcraft was seized, Juan was the

registered agent, managing member, and 75% shareholder of International Aviation. Carlos did not take over as the sole managing member of the company until April 21, 2008. Also based on records admitted, Agent Johnson stated that a March 18, 2008 bench warrant was issued for the arrest of Juan due to his failure to appear in state court for DUI charges. Agent Johnson also subpoenaed records from American Airlines and from these records, also admitted in evidence, testified that Juan purchased with cash tickets to travel on January 12, 2008 from Caracas to Miami, with a planned return flight on January 22, 2008. Rather than return on January 22, 2008, Juan returned earlier, on January 16, 2008. Records taken from the Beechcraft pilots show immediately before the seizure of the aircraft the plane had stopped for fuel at La Romana in the Dominican Republic on its way to Fort Lauderdale. The client name appearing on the fuel receipt is SERAMI.

Agent Johnson pointed out from photographs admitted in evidence metallic unpainted screws on the sides of panels on both sides of the aircraft. Individuals would have had to remove the panels in order to place the hidden cocaine inside the Beechcraft. It took the agents approximately two hours to remove the cocaine from inside the tail section of the plane. It would have taken approximately 15 minutes to remove each panel, and another 15 minutes to replace each panel given the number of screws holding them in place. Following a second tip from the confidential informant who had originally reported cocaine would be found aboard the aircraft, more cocaine was found two days after the seizure under the cargo panel; it took agents approximately three hours to remove the cargo and take out the cocaine. No black box or data recorder was on the plane. At the time the plane was seized, Carlos was 24 years old.

DEA Special Agent Michael Collett estimated it would have taken from eight to twelve hours to hide the cocaine in the Beechcraft in the sophisticated manner it was placed all around control

Case No. 08-61603-CIV-Altonaga/Brown

cables and hidden under the floorboards of the aircraft. The street value of the cocaine hidden in the aircraft is $3 million.

## II. Conclusions of Law

Under the Civil Asset Forfeiture Reform Act ("CAFRA"), the Government's initial burden is to establish "by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1). *See also United States v. One 1988 Checolet 410 Turbo Prop Aircraft*, 282 F. Supp. 2d 1379, 1381 (S.D. Fla. 2003). As previously stated, International Aviation stipulated at trial that the Government had met its initial burden. Thus, the trial proceeded to address International Aviation's affirmative defense of innocent owner, and it is this issue which the undersigned is asked to resolve.

Once the Government establishes probable cause, the burden of proof in a civil forfeiture proceeding shifts to the claimant to show the property is not subject to forfeiture. *United States v. A Single Family Residence and Real Property Located at 900 Rio Vista Blvd., Fort Lauderdale*, 803 F.2d 625, 629 (11th Cir. 1986). For example, an innocent owner's interest in property may not be forfeited. 18 U.S.C. § 983(d)(1). A claimant relying on this defense then has the burden to prove it is an innocent owner by a preponderance of the evidence. *Id.*; *see also United States v. One Single Family Residence at 2200 SW 28th Ave.*, 204 F. Supp. 2d 1361, 1365 (S.D. Fla. 2002) (same). For a property interest in existence at the time of the illegal conduct giving rise to forfeiture, as is the case here, "innocent owner" means an owner who "(i) did not know of the conduct giving rise to forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." 18 U.S.C. § 983(d)(2)(A). International Aviation asserts it is an innocent owner because it did not know of the

conduct giving rise to the forfeiture.

Before addressing the sufficiency of the evidence supporting International Aviation's lack of knowledge, however, the Court must first address the issue of Claimant's standing, a threshold issue. *See United States v. Real Property & Improvements Located at 5000 Palmetto Drive, Ft. Pierce, St. Lucie County, Fla.*, 928 F.2d 373, 375 (11th Cir. 1991). The Government acknowledges that International Aviation has Article III standing. *See United States' Amended Findings of Fact and Conclusions of Law* [D.E. 108] at 13; *United States v. $38,000.00 Dollars in U.S. Currency*, 816 F.2d 1538, 1543 (11th Cir. 1987) ("[U]nless they have Article III standing, federal courts lack jurisdiction to consider their claims, including their claim that the government did not have the requisite probable cause to seize the defendant property.") (footnote call number omitted). The Government challenges, however, International Aviation's statutory standing. *See $38,000.00 in U.S. Currency*, 816 F.2d at 1544 (statutory standing is threshold issue).

To qualify as an "owner" under CAFRA, and therefore to have statutory standing, a person must "have an ownership interest in the specific property sought to be forfeited," 18 U.S.C. § 983 (d)(6)(A), and, of particular significance in this case, the owner cannot be "a nominee who exercises no dominion or control over the property." *Id.* § 983(d)(6)(B)(iii). Bare legal title by one who does not exercise dominion or control over the property is insufficient to establish standing to challenge a forfeiture. *900 Rio Vista Blvd.*, 803 F.2d at 630 (claimant corporation's act of purchasing residence and real property found insufficient to establish ownership of property which was controlled by drug dealer, the boyfriend of the president of the corporation) (citations omitted). Courts will look behind formal title to property to determine whether the record title owner is merely a "strawman" set up to conceal the illegal dealings of someone else. *United States v. One 1977 36 Foot Cigarette Ocean*

Case No. 08-61603-CIV-Altonaga/Brown

*Racer, Florida Registration No. FL935OCT*, 624 F. Supp. 290, 295 (S.D. Fla. 1985). Indeed, failing to look beyond the bare legal title or to consider whether a claimant has a property interest under state law "would foster manipulation of ownership by persons engaged in criminal activity." *United States v. Morgan*, 224 F.3d 339, 343 (4th Cir. 2000) (citation omitted).

While "[c]ourts generally examine state law to determine whether a person has a valid ownership interest pursuant to § 983(d)(6)(A), . . . [t]he exceptions in § 983(d)(6)(B) must be considered independent of state law." *United States v. Real Property Known as 1866 Center Road, Wilmington*, No. 1:03-CV-850, 2008 WL 906061, at *3 (S.D. Ohio Mar. 31, 2008) (internal citations omitted). *See also United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1015 (8th Cir. 2003) ("Ownership interests are defined by state law with one important exception – Congress has declared that a 'nominee who exercises no dominion or control over the property' may not be an innocent owner."). And although the language used in subsection 983(d)(6)(B)(iii) is "*no* dominion or control over the property" (emphasis added), courts construing and applying this subsection examine the *degree, quality and genuineness* of dominion or control, if any, that a claimant challenged on this ground possesses over the subject property. If the degree of dominion or control is small, or if it is merely a cover for the control exercised by the true owner, it is tantamount to no dominion or control at all and divests the claimant of the status of owner. A review of relevant case law is instructive.

In *United States v. One 1981 Datsun 280ZX*, 563 F. Supp. 470 (E.D. Pa. 1983), the court found claimant was not the actual owner of a Datsun automobile used by the claimant's son to facilitate the purchase of controlled substances, and thus had no standing to challenge its forfeiture. Noting that "'[t]he possession of bare legal title to the res may be insufficient to establish

13

ownership,'" the court went on to examine who it was who stood to suffer from the loss of the vehicle. *Id.* at 474 (quoting *United States v. One 1945 Douglas C-54 (DC-4) Aircraft, Serial No. 22186*, 604 F.2d 27, 28 (8th Cir. 1979), *on appeal after remand*, 647 F.2d 864 (8th Cir. 1981)). The court found the son, and not the elderly claimant, stood to suffer from the forfeiture of the sports car as it was the son who drove the car while the claimant-father never did; the claimant did not purchase the car even though his name was on the title and insurance policy; and the son selected the turbo-charged car and its accessories, negotiating with the dealer for the purchase and making a cash purchase for the car. *Id.* at 475. In short, the claimant-father was simply a "front man" for his son, and it was the son who stood to suffer from the loss of the vehicle. *Id.* at 476.

The court in *One 1981 Datsun* was persuaded by the fact scenario presented in *One 1945 Douglas C-54*, 604 F.2d 27. In *One 1945 Douglas C-54*, the claimant purported to be the owner of an aircraft forfeited under 21 U.S.C. § 881(a)(4), as he had purchased the plane and was listed as the owner on the registration certificate and bill of sale of the aircraft. 604 F.2d at 29. In remanding the case to the district court to consider the claimant's standing to challenge the order of forfeiture, the appellate court noted another individual had supplied the purchase money to the claimant and considered himself the owner of the aircraft. *Id.* On appeal after remand, the appellate court affirmed the lower court's judgment dismissing intervention by the record-owner, who had merely operated as the real owner's front-man. 647 F.2d at 867.

In *United States v. The Premises and Real Property with Bldgs., Appurtenances and Improvements at 500 Delaware Street, Tonawanda, New York*, the Government brought a civil *in rem* action against real property in which marijuana plants were found growing. 113 F.3d 310 (2d Cir. 1997). In affirming the trial court's conclusion that the father was a mere straw owner and

lacked standing to assert a claim as innocent owner, the court noted the father and his wife had given the property to the son; after the son was arrested the son purported to transfer it back to the father for $1.00 to avoid forfeiture; the son continued in possession even though the father's name appeared on the deed; the son received all rent payments and made payments on the property. *Id.* at 312.

In *1866 Center Road, Wilmington*, the court granted summary judgment for the Government, finding a claimant was not an owner under section 983(d)(6)(B)(iii) because she had exercised no dominion or control over the property, notwithstanding her ownership of the property. 2008 WL 906061, at *4. The claimant did not reside at the property at any time, she did not pay insurance, utilities, property taxes, or other bills related to the property. *Id.* And the claimant's ability to dispose of an undivided one-half interest in the property under a statutory warranty deed, a right she never sought to exercise, was insufficient to establish that dominion or control. *Id.*

In *Morgan*, the court affirmed a finding by the lower court that the wife of a convicted drug offender was not a third party possessing a property interest in substituted assets[2] (a certificate of deposit and checking account), and thus the assets were not property of the defendant. 224 F.3d at 342. Significant to the court's finding that the wife did not exercise dominion or control were the following factors: a checking account was opened by the husband to facilitate the purchase of a residence; while some of the wife's payroll checks were deposited into the account, the wife never withdrew any money from that account, and all bank statements were sent to the husband; and the money used to open a certificate of deposit came from the defendant and only the defendant controlled the CD. *Id.* at 344-45.

---

[2] 21 U.S.C. § 853(p).

Case No. 08-61603-CIV-Altonaga/Brown

*United States v. U.S. Currency, $81,000.00*, presents an example of an appellate court disagreeing with the district court's finding that a claimant, John Bulger, brother to a fugitive charged with money laundering and racketeering, did not exercise sufficient dominion and control over funds held in a bank account showing both brothers' names. 189 F.3d 28 (1st Cir. 1999). From a review of Bulger's grand jury testimony, the appellate court noted that bank statements had been mailed to Bulger's address; Bulger personally stored the documents in his kitchen; Bulger made withdrawals of significant amounts and stored the money in his home; Bulger had physical possession of the checkbook in his home; and of the two brothers, Bulger wrote checks on the account. *Id.* at 37. After the brother became a fugitive, Bulger made several transactions involving funds in the joint account without the fugitive brother's explicit direction. *Id.* Thus, based on "the quality and quantity of John Bulger's transactions involving the joint account," the court found Bulger exercised sufficient dominion and control over the account to have standing to contest the civil forfeiture. *Id.* at 39. The court distinguished the cases the district court had relied upon to find to the contrary, noting that those cases "all invariably have one theme in common: a lack of involvement by the legal title holder with the res." *Id.* (citing cases). Bulger acted like a joint owner, wrote checks and withdrew money; consequently, he exercised dominion and control over the account. *Id.*

International Aviation's innocent owner defense hinges on whether the undersigned believes it exercised dominion or control over the Beechcraft. And notwithstanding Carlos' personal involvement as detailed in the foregoing findings of fact, the undersigned cannot conclude Claimant, International Aviation, exercised dominion or control over the Beechcraft. The reasons are explained below.

16

Case No. 08-61603-CIV-Altonaga/Brown

International Aviation did not have any corporate funds to purchase the Beechcraft with. Certainly at the time of initial discussions with Raytheon, Juan anticipated buying the aircraft for his other company, SERAMI. All of the money used to purchase the aircraft came from Juan following Caroni's sale of another plane. Carlos has no shares or interest in Caroni. It is Juan who stands to suffer from the loss of the aircraft he paid for, not International Aviation, who paid nothing for it and has not paid anything since for its maintenance or upkeep.

At all times it has been Juan who has controlled the use of the airplane. Juan, again, is responsible for the payments made to maintain and repair the aircraft. Most of the payments were made in cash. Admittedly, the lease agreement between SERAMI and International Aviation places the maintenance responsibility upon the lessee. But that lease agreement, like the registration of the aircraft in International Aviation's name, is only a front. No lease payments in the full amount have ever been made. If indeed SERAMI is wholly responsible for the aircraft maintenance under a true lease agreement, there is no reason for Carlos, the corporate "owner's" representative, to "assist" in the repair and maintenance of the aircraft or even be present while work is being done by others. In short, the parties in question, Carlos and Juan, have not observed the formalities of corporate ownership in their handling of responsibilities associated with the aircraft.

The events surrounding the seizure of the airplane further evidence that Juan has been in control at all times. He made arrangements to be in South Florida in January 2008, and when things did not go as planned, he quickly changed his air travel to return to Venezuela shortly after seizure of the airplane. The putative owner of the aircraft, International Aviation, was never "formally" advised by Juan of its seizure because of Juan's purported desire not to worry his son, Carlos. Carlos learned of the seizure from a friend several days later. A true lessor would notify the owner of the

aircraft of its seizure by authorities. In truth, Juan did not inform Carlos of the events because the Beechcraft was Juan's concern and possession, not Carlos', not International Aviation's. The Court "is not required to believe the claimants' testimony even if uncontradicted." *United States v. Premises Known as 427 Chestnut St., Reading, Pa.*, 731 F. Supp. 183, 188 (E.D. Pa. 1990) (citations omitted).

International Aviation has not observed corporate formalities until recently. It has paid no taxes from 2004 to 2008. It has not paid its sole employee, Carlos, a salary; the salary has been paid by the plane's lessee, SERAMI. It only opened an account at Wachovia in October 2007. Lease payments for International Aviation's space in Fort Lauderdale are paid, when paid, by SERAMI. International Aviation sought to have receipts for the rented hangar space in Fort Lauderdale prepared for use at trial, and Carlos had to ask Gerry Milton to write the name of International Aviation on the receipts well after those payments had been made by SERAMI. International Aviation's sole employee, Carlos, knows nothing about the insurance on the aircraft, the only significant "corporate" asset

The Court does not reach the issue of whether the Government has presented sufficient evidence to justify piercing the corporate veil of International Aviation or that International Aviation was Juan's alter ego. *See United States v. Contents of Accounts Numbers 3034504504 and 14407143 at Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 971 F.2d 974 (3rd Cir. 1992) (district court's finding that corporation was straw owner of accounts owned and controlled by another not clearly erroneous). The evidence overwhelmingly supports a finding that International Aviation's title ownership of the Beechcraft was simply that and no more. It has bare legal title. At all times it was Juan who controlled the aircraft: from the negotiations surrounding its purchase, to control

Case No. 08-61603-CIV-Altonaga/Brown

over its maintenance and repair, to acquisition of insurance, to Juan's knowledge of the Beechraft's use on the day of the seizure and its ultimate seizure by authorities; to the hiring of counsel to represent the named Claimant in these proceedings. That corporate formalities were not observed is simply further evidence of the lack of dominion or control exercised by International Aviation over the aircraft.

Because of the lack of involvement by International Aviation with the subject Beechcraft other than acts done to maintain the appearance of true ownership, and because the one who stands to lose from forfeiture of the aircraft is Juan, not International Aviation, International Aviation has not satisfied its burden of showing it exercised dominion or control over the *res*. Consequently, International Aviation lacks statutory standing to object to the forfeiture of the airplane, and the Court does not address its knowledge concerning the use of the aircraft to transport cocaine valued at $3 million on January 13, 2008.

Accordingly, it is

**ORDERED AND ADJUDGED** that Defendant, One 1990 Beechcraft 1900 C Twin Engine Turbo-Prop Aircraft, Venezuelan Registration No. YV219T, Serial UC118, is forfeited to the Government. A final judgment will be entered by separate order.

**DONE AND ORDERED** in Chambers at Miami, Florida this 25th day of September, 2009.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record